E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture and Recovery Section
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
Asset Forfeiture and Recovery Section
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1785
    Facsimile: (213) 894-0142
    E-mail: maxwell.coll@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>FUNDS SEIZED FROM VARIOUS BANK ACCOUNTS INVOLVED IN ROMANCE AND BUSINESS EMAIL COMPROMISE SCAMS,<br><br>        Defendant. | No.  2:23-cv-02397<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. §§ 981(a)(1)(A) and (C) and 984<br><br>[F.B.I.] |

Plaintiff United States of America brings this claim against defendant Funds Seized From Various Bank Accounts Involved In Romance And Business Email Compromise Scams (the "defendant bank funds"), and alleges as follows:

1

**JURISDICTION AND VENUE**

1. The government brings this in rem civil forfeiture action pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

2. This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

**PERSONS AND ENTITIES**

4. The plaintiff in this action is the United States of America.

5. The defendant bank funds consist of the following:

   a. $375,300.71 in bank funds seized pursuant to a federal seizure warrant from Citibank, N.A. ("Citibank") Account '9897 ("Citibank Account '9897"), held in the name of Haopeng Song and seized at Citibank, 5610 Sunrise Boulevard, Citrus Heights, California;

   b. $202,972.38 in bank funds seized pursuant to a federal seizure warrant from Bank of America, N.A. ("BoA") Account '3212 ("BoA Account '3212"), held in the name of Haili Zhang and seized at BoA, 12221 Artesia Boulevard, Cerritos, California;

   c. $178,025.82 in bank funds seized pursuant to a federal seizure warrant from HSBC Bank USA ("HSBC") Account '6072 ("HSBC Account '6072"), held in the name of Haopeng Song and seized at HSBC, 18182 Pioneer Boulevard, Artesia, California;

   d. $166,523.58 in bank funds seized pursuant to a federal seizure warrant from BoA Account '3980 ("BoA Account '3980"), held in the name of Haopeng Song and seized at BoA, 12221 Artesia Boulevard, Cerritos, California;

   e. $74,581.21 in bank funds seized pursuant to a federal

seizure warrant from East West Bank ("EWB") Account '8562 ("EWB Account '8562"), held in the name of Jing Jie, Inc., and seized at EWB, 11812 E. South St., Cerritos, California;

    f.  $36,985.30 in bank funds seized pursuant to a federal seizure warrant from BoA Account '2857 ("BoA Account '2857"), held in the name of Pan An ("An") and seized at BoA, 12221 Artesia Boulevard, Cerritos, California;

    g.  $2,579.51 in bank funds seized pursuant to a federal seizure warrant from BoA Account '7754 ("BoA Account '7754"), held in the name of Haopeng Song and seized at BoA, 12221 Artesia Boulevard, Cerritos, California; and

    h.  $397.32 in bank funds seized pursuant to a federal seizure warrant from Citibank Account '9889 ("Citibank Account '9889"), held in the name of Haopeng Song and seized at Citibank, 5610 Sunrise Boulevard, Citrus Heights, California.

6.  The defendant bank funds are currently in the custody of the United States Marshals Service in this District, where they shall remain subject to this Court's jurisdiction during the pendency of this action.

7.  The interests of Jing Jie, Inc., Haopeng Song, Haili Zhang, Pan An, and Zhili Song may be adversely affected by these proceedings.

**FACTS SUPPORTING FORFEITURE**

*Background of Investigation*

8.  The Federal Bureau of Investigation ("FBI") conducted an investigation into activity that included illegal money transmitting, mail fraud, wire fraud, money laundering, romance scams, and business email compromise ("BEC") scams. Among the money-laundering methods

detected was the practice of laundering proceeds through illegal money transmitting known as an Informal Value Transfer System ("IVTS").

9. Beginning in February 2017, and continuing to at least December 2017, various bank accounts received funds from numerous third-parties; these funds were traceable to victims of romance scams and other social-engineering schemes perpetrated against U.S. and foreign victims, or were retransmitted by money mules involved in the scams.

*Romance Scams*

10. A romance scam, also known as "confidence scam," occurs when a person deceives a victim into believing they have a trust relationship--whether familial, friendly, or romantic--and leverages the relationship to persuade the victim to send money, provide personal and financial information, or purchase items of value for the violator. Violators often use online dating sites to pose as U.S. citizens located in a foreign country, U.S. military members deployed overseas, or U.S. business owners seeking assistance with lucrative investments. In some cases, the victim is persuaded to launder money on behalf of the violator.

11. Victims of romance scams often do not recognize that they are being defrauded for many months or more, and sometimes never recognize that they have been defrauded, because they are, or believe they are, in love with the person making the false romantic overtures or promises to them. Therefore, it is not uncommon to observe multiple wires and transfers being sent to the same beneficiary or multiple beneficiaries over a period of time. Some victims of romance scams are not completely truthful with, or seek to impede law

4

enforcement officers who question them about the money they have transferred, in part to protect their purported romantic partner or friend. Some victims of romance scams become "mules" by agreeing to receive and retransfer funds that are the proceeds of other frauds at the instruction of their supposed romantic partner.

*BEC Scams*

12. A business email compromise ("BEC") scam, also known as "CEO Fraud," is a sophisticated fraud scheme that targets businesses and organizations by inducing employees with access to the targeted organization's payment systems to make wire transfers to bank accounts falsely represented to be those of a trusted business party, except the account is actually controlled by the fraudsters.

*Illegal Money Transmitting and Money Service Businesses*

13. A money-services business ("MSB") includes a person who provides money-transmission services. Pursuant to 18 U.S.C. § 1960(b)(1)(A), an unlicensed money services business is one that "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor under State law, whether or not the business operator knew that the operation was required to be licensed," or fails to comply with federal regulations requiring registration of such businesses.

14. The MSB registration requirement is found at 18 U.S.C. §§ 1960(a) and (b)(1)(B), which make it a crime to conduct similar activities or own such a business without registering with the FinCEN. Specifically, 31 C.F.R. § 1022.380(a) generally requires each MSB (whether or not licensed as a money service business by any State) to register with FinCEN.

15. In California, money transmitters are also required to be

licensed. Cal. Fin. Code § 2000, et seq. The Department of Business Oversight is the California state agency responsible for issuing licenses for businesses who desire to operate as money transmitting businesses in California. The California Department of Business Oversight Directory of Money Transmitters records do not reflect Jing Jie, Inc., Haopeng Song, Haili Zhang, or Pan An as licensed money transmitting businesses in the State of California. Similarly, Financial Crimes Enforcement Network ("FinCEN") MSB Registrant records do not reflect Jing Jie, Inc., Haopeng Song, Haili Zhang, or Pan An registered as a money transmitting businesses, meaning they did not comply with federal regulations regarding the registration of money transmitting businesses, were not at any relevant time registered with the FinCEN, as required by 31 U.S.C. § 5330, and were not licensed in the state of California.

16. MSBs are not only required to be licensed and registered, but must comply with Bank Secrecy Act anti-money-laundering regulations, such as filing required Form 8300 Reports of Cash Payments Over $10,000 Received in a Trade or Business, which identify persons involved in large currency transactions. In addition, MSBs must file FinCEN Form 104s (CTRs) for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to the MSB that involves more than $10,000 in currency. Multiple transactions must be treated as a single transaction if the MSB has knowledge that (1) they are by or on behalf of the same person; and (2) they result in more than $10,000 in currency either having been received (Cash In) or disbursed (Cash Out) during any one business day. MSBs who are not licensed or registered tend not to adhere to such anti-money-laundering laws and regulations.

*Funds from Victim L.W.L.*

17. As part of a romance scam, L.W.L. ordered wire transfers totaling over $457,000 into EWB Account '8562, BoA Account '2857, and BoA account '3212.

18. L.W.L. met Palmer Leonard Hood ("Hood") on Facebook ("FB") in August of 2017. Hood told L.W.L. that he was in the oil and gas business, and then communicated through text messages and conversations over the phone. L.W.L. described Hood as an American citizen, born in Turkey, who was in his mid-50s, and with a permanent residence in Oregon. L.W.L. never met Hood in person, but L.W.L. stated that Hood was a good man and considered Hood to be her fiancé.

19. Hood purportedly was working on an oil and gas project for Diamond Offshore in the Gulf of Mexico worth approximately $23 million. Hood requested L.W.L.'s help in paying for expenses incurred during the project. These expenses included helicopter rides to transport Hood's workers from the oil rig to land and to pay for the delivery of the oil. L.W.L. stated she wired funds on behalf of Hood to pay for his expenses. Hood provided L.W.L. with the names and bank account information of Hood's purported vendors to wire the funds: Haopeng Song, Cadex Logistics, Pan An, and Haili Zhang. L.W.L. considered the funds she wired as a loan to Hood. L.W.L. stated that Hood promised to marry her and pay back the money when he finished the project and returned to the United States.

20. L.W.L. stated that Hood has since completed the project for Diamond Offshore, and the $23 million has been deposited into Hood's Standard Chartered bank account in Mexico, which he tried to wire to L.W.L. However, Hood told L.W.L. that when he tried to wire the funds to L.W.L.'s Wells Fargo Bank Account, the wire transfer attempt

7

was unsuccessful because wire fees were required to be paid to a U.S. agency called the International Monetary Fund ("IMF"). Hood claimed that until the fees were paid, he would not have access to the balance in the Standard Charter account, and L.W.L. would not get her money back.

*Funds from J.S.*

21. As a part of a romance scam, on or about October 17, 2017, J.S. wired $7,000 from her bank account to HSBC Account '6072.

22. J.S stated she met a person identified as Tarun Gupta ("Gupta") six months earlier through "shaadi.com," an online wedding service website.

23. J.S.'s husband passed away in 2015. The money J.S. sent to HSBC Account '6072 was part of a $100,000 life-insurance payout after J.S.'s husband's death.

24. J.S. and Gupta only communicated online and telephone, and never met in person. Gupta, who claimed to have been an engineer stationed in Dubai, shared his life history and pictures with J.S.

25. Gupta asked J.S. to lend him $20,000 to purchase oil as an investment, assuring J.S. that he would pay her back later. Gupta instructed J.S. to wire the money to an account belonging to an agent, "Dianwei Wang." Gupta also asked J.S. to lend him an additional $10,000 to transport the oil he had purchased, and instructed her to wire the money (that Gupta described as an account belonging to an agent "Dianwei Wang").

*Funds from A.D.*

26. As part of a romance scam, A.D. ordered a wire transfer of $68,000.00 into BoA Account '7754.

27. A.D. told investigators that she met a man who said his

8

name was Samuel Christian ("Christian") sometime in April or May of 2015 on a website called Christian Mingle ("CM"). CM was a website marketed toward Christian singles who are seeking a God-centered relationship. Christian claimed to be an American in the oil business stationed in the United Kingdom. A.D. stated she believes she is in a romantic relationship with Christian even though she has never met him in person.

28. Christian told A.D. he had completed an oil contract for Spain and was owed millions of dollars. However, Christian needed to pay the taxes in order to collect the funds he was owed. Christian asked A.D. for $68,000 to pay the taxes. Christian introduced A.D. to someone who purportedly worked for Allianz Financial named Haraldur Hoffman ("Hoffman"). Hoffman instructed A.D. to wire funds to Haopeng Song, who was presented to A.D as a U.S.-based agent filling out the paperwork for Christian.

*Funds from L.W.*

29. As part of a romance scam, L.W. ordered a wire transfer of $100,000.00 into Citibank Account '9889.

30. L.W. told investigators that she met a man who said his name was Paul Antonio Curry ("Curry") on Christian Mingle in September of 2017. Curry claimed to be an independent contractor working on an offshore oil rig in St. John's in Newfoundland, Canada. L.W. communicated with Curry via email and texted and spoke with him on her cellphone. L.W. has never met Curry in person. L.W. stated Curry had an accent. Curry told L.W. that he was French and resided in Aurora, Illinois. L.W. stated that she had fallen in love with Curry very quickly. Curry knew all the right things to say to L.W. and she believed Curry was the man with whom she wanted to spend the

9

rest of her life.

31. Curry introduced L.W. to an escrow agent, Haraldur Hoffman ("Hoffman"), who was represented as a private banker working for Allianz Financial Service. Sometime in October was the first time Curry asked L.W. for money. L.W. resisted at first because she barely knew Curry. To lessen L.W.'s concerns about sending money to someone she had just met, Curry offered to make L.W. a beneficiary on his escrow account through which Curry would receive money from Watson; and through which L.W. could be paid back. Curry told L.W. he needed money because there was an explosion on the oil rig and he needed money to do repairs and replace equipment.

32. Based on the investigation, L.W. sent two of the wires from a First National Bank of Michigan account held in the name of her company. L.W. stated Hoffman initially wanted her to send money to a beneficiary in China, but L.W. was uncomfortable sending money to China. Hoffman arranged for beneficiaries located within the United States to whom L.W. could send money on his behalf. L.W. stated she sent about four wires for the benefit of Curry. She told investigators that she also sent money to pay for a helicopter to have Curry taken off the oil rig. L.W. sent money advanced from her credit cards, line of credit and loans, as well as from her Individual Retirement Account (IRA), even paying 28% in early withdrawal penalties.

*Funds from J.W.*

33. On or about November 8, 2017, the FBI spoke with KeyBank investigator Casey Gauthier ("Gauthier"). Gauthier stated that on or about October 18, 2017, J.W.'s bank account received an international wire in the amount of $36,889 from a Westpac Bank account in New

Zealand. Gauthier learned that Westpac's customer, Aztech Building, made the wire transfer to the J.W. account in a business email compromise scam. Gauthier advised when J.W. was asked by a KeyBank employee about the wire transfer she had received, J.W. initially stated the wire was sent by her husband who was out of the country for work, and that she wired the funds to HSBC Account '6072, for the benefit of her husband. When questioned further, J.W. stated that she was not actually married, and the wire was to help pay for her wedding. J.W. stated she kept $800 and immediately transferred the remaining $36,000 to HSBC Account '6072.

34. Investigators believe J.W. is either a victim of a scam who was turned into a money mule or was recruited to function as a conduit for laundering fraudulent proceeds.

*Interview of Haopeng Song*

35. On December 22, 2017, FBI agents interviewed Haopeng Song, who stated he was a student from China enrolled at the University of Southern California ("USC"). Haopeng Song claimed he was unemployed but was in the market to purchase a house in Irvine, California, for around $1.5 million. Haopeng Song further claimed the source of the funds he intended to use to pay for the house would be from his parents in China.

36. Haopeng Song acknowledged his awareness of the $50,000.00 per year, per person restriction in China that bars its citizens from converting and sending Chinese currency abroad. To be able to send $1.5 million from China to the United States, Haopeng Song needed to find a way to circumvent the $50,000.00 restriction. Haopeng Song stated he was introduced to Dianwei Wang ("Wang") through his real estate agent and was told that Wang was someone who could help

facilitate converting the currency. Wang charged 1.5% of the total transaction for this service.

37. Haopeng Song stated Wang instructed him to obtain bank accounts to receive deposits to decrease the risk of the accounts being flagged. Haopeng Song had a BoA account he had been using before he met Wang. Thereafter, Haopeng Song opened a Citibank account with a HSBC account to receive deposits arranged by Wang.

38. Haopeng Song further stated Wang also instructed him to identify and obtain accounts belonging to other individuals, whose accounts could be used as intermediary accounts to receive deposits. Wang instructed Haopeng Song to open more accounts to use as intermediary accounts in order to reduce risk from receiving too many wires. Haopeng Song obtained BoA account information from his friends, INDIVIDUAL 1 and INDIVIDUAL 2, who agreed to receive wires into their individually held bank accounts to transfer the funds to one of Haopeng Song's bank accounts. Haopeng Song stated INDIVIDUAL 1 and INDIVIDUAL 2 then transferred proceeds from several wires to one of his accounts, including into Citibank Account '9889 and BoA Account '7754.

39. Haopeng Song denied recognizing any of the names of the individuals who wired funds into his bank accounts, or the senders of cashier's checks made payable to his name. Haopeng Song stated that while he wondered why Wang was having strangers send funds to his accounts, he was not interested in finding out the reasons.

*Interview of Pan An*

40. Pan An is a Chinese citizen who resides in China. Pan An is a friend and business partner of Haili Zhang. Pan An and Haili Zhang were starting a restaurant business together in California and

needed to capitalize the business with startup funds.

41. Pan An stated that every Chinese citizen is limited to $50,000 per year per person from transferring money out of China.

42. Pan An's friend Haili Zhang told him about an agent, "Dami," who could help exchange and transfer Chinese currency in China into U.S. dollars in the United States.

43. Pan An stated that he transferred Chinese currency into Dami's bank account in China. Shortly thereafter, a BoA account in Pan An's name received two wire transfers totaling $150,000 from victim L.W.L.

44. Pan An stated that he believed that the funds in U.S. dollars were being deposited into BoA Account '2857 by Dami in exchange for the Chinese currency that Pan An deposited into Dami's bank account in China.

*The Subject Accounts*

45. The investigation revealed that there are no likely sources for the funds deposited into the Subject Accounts other than incoming wires or deposits of funds from victims of romance and social engineering schemes, transfers of fraud proceeds from money mules' accounts to a Subject Account, fraud proceeds being laundered through money-laundering methods and techniques, or funds linked to illegal MSBs and/or unreported transportation of currency or monetary instruments over $10,000 into the United States from outside the United States, in violation of 31 U.S.C. § 5316.

46. Below is a sampling of fraudulent proceeds deposited into the subject accounts. The victims and money mules have related similar stories about having been lured into online relationships with persons whom they had never met, and then induced to wire funds

to certain subject accounts by their online "friends."

Tracing of Illegal Proceeds in Citibank Account '9897<br>and Citibank Account '9889

47. On or about August 18, 2017, Citibank Account '9897 and Citibank Account '9889 were opened in the name of Haopeng Song. Between October 24 and November 22, 2017, Citibank Account '9889 received six wire transfers totaling $419,942:

    a. On or about October 24, 2017, a wire transfer of $100,000.00 was deposited into Citibank Account '9889 from an account with Horizon Bank in the name of W.L.

    b. On or about October 24, 2017, a wire transfer of $49,975.00 was deposited into Citibank Account '9889 from an account with Bank of America in the name of D.S.

    c. On or about October 27, 2017, a wire transfer of $25,000.00 was deposited into Citibank Account '9889 from an account with Bank of America in the name of victim L.W.L.

    d. On or about October 27, 2017, a wire transfer of $50,000.00 was deposited into Citibank Account '9889 from an account with Bank of America in the name of A.T.

    e. On or about November 15, 2017, a wire transfer of $154,967.00 was deposited into Citibank Account '9889 from an account with Bank of America in the name of E.S.

    f. On or about November 22, 2017, a wire transfer of $40,000.00 was deposited into Citibank Account '9889 from an account with Digital Federal Credit Union in the name of U.Y.

48. Subsequently, investigators' review of bank records for the Citibank Accounts revealed that shortly after Citibank Account '9889 received these incoming wires of fraudulent proceeds, transfers of

funds in equivalent amounts were made into Citibank Account '9897 between October 30 and November 28, 2017.

<u>Tracing of Illegal Proceeds Deposited into BoA Account '3212</u>

49. On or about April 16, 2009, BoA Account '3212 was opened in the name of Haili Zhang POD (Paid on Death) Nicole Jixiang Braeger. Zhang presented a California driver's license as a form of identification when an update signature card was signed.

50. On or about October 27, 2017, BoA Account '3212 received two wire transfers totaling $155,000 sent by victim L.W.L.

51. Zhang stated that the two wires sent by victim L.W.L. were for funds that were converted from Chinese currency in China into U.S. dollars.

<u>Tracing of Illegal Proceeds Deposited into HSBC Account '6072</u>

52. On or about September 27, 2017, HSBC Account '6072 was opened in the name of Haopeng Song with a $500 deposit. There was no further substantial activity in the account until October 17, 2017.

53. Between October 17 and 18, 2017, BoA Account '6072 received five wire transfers totaling $177,600:

a. On or about October 17, 2017, a wire transfer of $100,000.00 was deposited into HSBC Account '6072 from an account with HSBC Bank Middle East Dubai in the name of M.P.T.

b. On or about October 17, 2017, a wire transfer of $7,000.00 was deposited into HSBC Account '6072 from an account with Bank of America in the name of J.S.

c. On or about October 17, 2017, a wire transfer of $18,000.00 was deposited into HSBC Account '6072 from an account with Digital Federal Credit Union in the name of U.Y.

d. On or about October 17, 2017, a wire transfer of

$16,600.00 was deposited into HSBC Account '6072 from an account with Marine Credit Union in the name of E.M.S.

  e. On or about October 18, 2017, a wire transfer of $36,000.00 was deposited into HSBC Account '6072 from an account with Keybank in the name of J.W.

### Tracing of Illegal Proceeds Deposited into BoA Account '7754 and BoA Account '3980

54. On or about September 27, 2012, BoA Account '7754 and BoA Account '3980 were opened at BoA in the name of Haopeng Song. Between September 29 and November 28, 2017, BoA Account '7754 received five wire-transfer deposits totaling $158,500:

  a. On or about September 29, 2017, a wire transfer of $8,000.00 was deposited into BoA Account '7754 from an account with JPMorgan Chase Bank in the name of A.B.

  b. On or about October 2, 2017, a wire transfer of $20,000.00 was deposited into BoA Account '7754 from an account with FirstBank in the name of T.M.

  c. On or about October 5, 2017, a wire transfer of $28,500.00 was deposited into BoA Account '7754 from an account with Grandview Bank in the name of D.T.

  d. On or about October 31, 2017, a wire transfer of $68,000.00 was deposited into BoA Account '7754 from an account with Wells Fargo Bank in the name of A.D.

  e. On or about November 28, 2017, a wire transfer of $34,000.00 was deposited into BoA Account '7754 from an account with Amoco Federal Credit Union in the name of R.M.S.

55. Investigators' review of bank records for the BoA Accounts revealed that shortly after the BoA Account '7754 received incoming

wires of fraudulent proceeds, transfers of funds into the BoA Account '3980 Account were made in the same or approximately the same amounts.

Tracing of Illegal Proceeds Deposited into EWB Account '8562

56. On or about October 16, 2017, East West Account '8562 was opened in the name of Jing Jie Inc. at East West Bank by Haili Zhang. Haili Zhang presented a California driver license as a form of identification when the account was opened.

57. Between November 10 and December 11, 2017, EWB Account '8562 received two check deposits totaling $150,000 from BoA Account '2857.

Tracing of Illegal Proceeds Deposited into BoA Account '2857

58. On or about February 7, 2017, BoA Account '2857 was opened in the name of Pan An with a deposit of $1,580. Pan An presented a Chinese passport as a form of identification when the account was opened.

59. On or about October 27, 2017, BoA Account '2857 received two wire transfers totaling $150,000 from victim L.W.L.

**FIRST CLAIM FOR RELIEF**

60. Based on the above, plaintiff United States of America alleges that the defendant bank funds constitute or are derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 (mail fraud), and/or 1343 (wire fraud), which are specified unlawful activities as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). To the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds

are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

### SECOND CLAIM FOR RELIEF

61. Based on the above, plaintiff United States of America further alleges that the defendant bank funds constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and/or and (a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. §§ 1341 (mail fraud) and/or 1343 (wire fraud). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). To the extent that the defendant bank funds are not the actual monies or assets directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

### THIRD CLAIM OF RELIEF

62. Based on the above, plaintiff United States of America further alleges that the defendant bank funds were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1960. The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). To the extent that the defendant bank funds are not the actual monies or assets directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified

offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the defendant bank funds;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) this Court decree forfeiture of the defendant bank funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: March 31, 2023

E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture and Recovery Section

   /s/ *Maxwell Coll*
MAXWELL COLL
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

<u>VERIFICATION</u>

I, Lance Kim, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation and am the case agent for the forfeiture matter entitled <u>United States of America v. Funds Seized From Various Bank Accounts Involved In Romance And Business Email Compromise Scams</u>.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March <u>30</u>, 2023 in Los Angeles, California.

*Lance H Kim*
Lance Kim